In re MID–CONTINENT ELECTRIC, INC. Debtor.

Mid–Continent Electric, Inc. Plaintiff,

v.

Fifth Third Bank and James E. Kingsbury, Defendants.

Bankruptcy No. 00–12791–9P1.

Adversary No. 01–144.

United States Bankruptcy Court, M.D. Florida, Fort Myers Division.

April 26, 2002.

Louis X Amato, Louis X. Amato, P.A., Naples, FL, for plaintiff.

Jeffrey W. Leasure, Leasure & Heidkamp, P.A., Fort Myers, FL, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy Judge.

The matter under consideration in this yet-to-be confirmed Chapter 11 case is an eight count Complaint filed by Mid–Continent Electric, Inc. (Debtor) who named Fifth Third Bank of Florida (Bank) and James E. Kingsbury (Kingsbury) as defendants. Although, as noted, there are eight counts in this Complaint, the immediate matter under consideration is limited to the claim in Count I, which is a claim by the Debtor that the pledge by the Debtor of its assets to secure the indebtedness of Douglas McIntyre (McIntyre) was fraudulent, thus avoidable, pursuant to 11 U.S.C. § 544(b) and Fla. Stat. § 726.106(1).

The claims in Count III, IV, VII, and VIII are asserted against Kingsbury; however, by compromise, the claims

against Kingsbury have been settled. Accordingly, by stipulation of the parties, the present matter is limited to consider the fraudulent claims of the Debtor against the Bank and specifically, whether or not as a result of the pledge of all of the assets of the Debtor to secure a loan of its principal, McIntyre, and not the debt of the Debtor, in a leverage buy-out (LBO), rendered the Debtor insolvent.

In Count II, the Debtor seeks the identical relief under a different theory, that is based on Fla. Stat. § 726.105, and seeks a termination of its guaranty of the note and a declaration that the security interest claimed by the Bank is invalid and unenforceable.

In Count V, the relief sought is a subordination of the Bank's claim pursuant to Section 510(c) of the Code. And, in Count VII of its Complaint, the Debtor seeks valuation of collateral securing the claims of the Bank in the event it is found to be valid and enforceable for the purpose of determining the nature and the allowable secured claim of the Bank.

It was agreed by the parties that the claims relating to subordination of the Bank's claim shall be deferred pending the resolution of the fraudulent transfer claims asserted by the Debtor. Thus, this Court will consider only whether or not the transfer involved was fraudulent pursuant to Fla. Stat. § 726.106(a) and pursuant to Section 544(b) of the Code.

The facts as relevant to the narrow issue controlling this controversy which is whether or not the Debtor became insolvent as a result of the transfer under consideration are as follows.

At the time relevant, the Debtor was and still is engaged in the business of an outdoor electrical contractor, installing traffic signals and highway lighting for governmental entities and private custom-ers. Prior to 1985, Kingsbury was the 100 percent stockholder and the principal of the Debtor. In 1985, the Debtor employed McIntyre as an estimator for the business. On or about June 21, 1991, McIntyre and Kingsbury entered into an agreement entitled "Agreement Mid–Continent Electric, Inc." (Agreement) (Def.'s Ex. 1H). Pursuant to the terms of the Agreement, Kingsbury agreed to have the Debtor issue to McIntyre one share of its stock and agreed to have the Debtor issue one additional share for the ten years thereafter. In total, McIntyre would own 11 shares of the Debtor and Kingsbury would own 10 shares of the Debtor. At that time, McIntyre would be the majority shareholder of the Debtor. However, instead of the ten years time frame as set forth in the Agreement, the process was accelerated and by 1993, McIntyre became a 50 percent stockholder of the Debtor, each owning 10 shares each of the Debtor's stock.

Kingsbury, because of his poor health and his involvement with another business, indicated that he wanted to sell his interest in the Debtor to McIntyre. In 1995 and 1996, Kingsbury's health deteriorated and it was evident that he would not be able to carry on his responsibilities with the Debtor. Initially, Kingsbury asked for $2 million for his 50 percent interest in the Debtor. McIntyre attempted to obtain financing and approached Northern Trust Bank and asked how much money he could borrow to consummate this transaction. Northern Trust Bank indicated that the maximum amount would be $800,000. Kingsbury declined to accept $800,000 for his interest and indicated that he would not take anything less than the initial offer of $2 million.

At that time, the Debtor banked with the Bank. McIntyre approached the Bank and inquired about financing his planned purchase of the stock from Kingsbury.

The Bank indicated that it was willing to loan $1.6 million but Kingsbury declined this offer again, indicating that he must have the full $2 million. Ultimately, the parties agreed that, in addition to the loan from the Bank of $1.6 million, Kingsbury would take back a note representing a separate obligation for $400,000, to make up the difference.

It is without dispute that McIntyre could not have purchased the stock from Kingsbury with his own funds or with his own assets. It is equally clear that he had no resources whatsoever to repay the $2 million obligation personally, and this debt could only be serviced with the revenues generated by the Debtor. The obligation owed to the Bank represented by the note required monthly payments of $20,000. In addition, the Kingsbury note required monthly payments of $4,644.34, or a total of approximately $25,000 a month in servicing the debt as a result of the LBO.

The closing took place on June 25, 1998, for the purchase by McIntyre of Kingsbury's 50 percent interest in the Debtor for a total of $2 million. This transaction was funded by a promissory note (Note) payable to the Bank by McIntyre and his wife Karen McIntyre in the amount of $1.6 million and a security agreement (Security Agreement) executed by the Debtor (Def.'s Ex. 1B & 1C). The loan was guaranteed by the Debtor as a result of the Debtor pledging all of its tangible and intangible assets as collateral for this obligation. The proceeds of the loan, in the amount of $1.6 million, were paid to Kingsbury as part of the purchase price.

In addition, McIntyre executed and delivered to Kingsbury a promissory note (Kingsbury Note) in the amount of $400,000 (Def.'s Ex. 1D), representing the balance of the purchase price of the stock. This obligation was secured by specific personal property owned by the Debtor, but junior and inferior to the security interest granted by the Debtor to the Bank on the identical collateral. This was documented by the execution of a security agreement, executed by the Debtor and McIntyre in favor of Kingsbury (Def.'s Ex. 1D). As part of the transaction, Kingsbury entered into a Non–Competition Agreement and Consultation Agreement (Def.'s Ex. 1I & 1J). Pursuant to these Agreements, Kingsbury agreed not to compete with the Debtor, and further agreed to permit the Debtor to use his primary qualifier license as an electrical contractor for a three-year period of time.

On August 17, 2000, the Debtor filed its Petition for Relief under Chapter 11 in this Court. The Complaint against the Bank and Kingsbury was filed on May 14, 2001. In due course, both Defendants were served and filed their Answers, which basically consisted of some general admissions and some denials. Both the Debtor and the Bank have stipulated that all operating elements for fraudulent transfer claim under Section 726.106(1) of the Florida Statutes are without dispute and were established with the exception of whether or not, as a result of the pledging of all of the assets of the Debtor to secure the debt of McIntyre in order to enable him to purchase the stock interest of Kingsbury, it rendered the Debtor insolvent.

There is no contention and apparently there is no evidence that the Debtor was unable to pay its debts as they became due prior to this transaction and possibly immediately thereafter. It is also without dispute that the Debtor was not insolvent prior to this transaction. It is apparent from the foregoing that the issue of the resulting insolvency from this transaction described above is the crux of this controversy.

Since the burden is on the Debtor, it is clear that if the evidence presented is in

equilibrium, that is equally supports the claim of the resulting insolvency and the claim of the opposite, the Debtor has failed to carry the burden with the requisite degree of proof, and its claim must fail.

The following documents admitted into evidence that are relevant to the issue under consideration are as follows. First, there is an audited Financial Statement (Def.'s Ex 1F), purporting to reflect the financial conditions of the Debtor as of April 30, 1998, submitted on August 1998, about two months after the closing of the LBO. This audit was prepared by James M. Gualario (Gualario), a Certified Public Accountant.

Second, there is a Preliminary Draft of an Audit Report of the Debtor for the fiscal year ending April 30, 1999, prepared by Nathan A. Phillips (Phillips), a Certified Public Accountant of the accounting firm of Wentzel, Berry, Wentzel & Phillips, P.A. (Joint Ex. 2). According to Phillips, due to the internal control structure and the Debtor's operation, the reportable conditions, under the standards established by American Institute of Certified Public Accountants, contained significant deficiencies, and therefore, due to his inability to verify several items, notably, the status of the accounts receivable, he disclaimed the authenticity of the data included in the report. Phillips was unwilling to certify the report as an audited Financial Statement.

Third, is another unaudited Financial Statement prepared by Joel S. Miller (Miller), CPA of the accounting firm of Miller & Westerfer, P.A. (Pl.'s Ex. 1). This report is also based on the internal records of the Debtor. The final "Audited Financial Statement" of the Debtor submitted into evidence is a report prepared by L. Gail Markham, CPA (Markham) (Def.'s Ex. 1).

According to the Audited Financial Statement prepared by Gualario, the financial condition of the Debtor as of April 30, 1998, indicates that the total assets of the Debtor was $4,161,961, and liabilities $2,817,761, or stockholder's net equity of $1,344,200. The record is unrebutted that this audited financial statement was seriously deficient in many respects. There is a total lack of evidence of any pre-audit and post-audit analytical procedures conducted, as required by SAS # 56. There is no evidence that the appropriate audit programs were used to conduct and oversee the audit process. Moreover, there is no evidence from the statement indicating that procedures were performed to evaluate the organization's ability to continue as a going concern. There is no evidence that the auditing firm complied with SAS # 55, which requires the auditing firm to obtain an understanding of the organization's internal control structure. The record reflects that there was insufficient field work performed. There was no evidence to establish that the auditing firm complied with SAS # 82, which requires an auditing firm to assess potential fraud factors.

Although there were confirmation letters sent and received regarding the accounts receivable of the Debtor, there was no evidence that the information was agreed to with respect to the accounts receivable aging amounts. And, most importantly, the auditing costs and estimated earnings in excess of billings, which is absolutely essential in construction accounting, was lacking. For the reasons stated, this Court is satisfied that the audited financial statement prepared by Gualario is totally unreliable and therefore, this Court will not consider any of the data contained in the first audited financial statement.

The same statements are also applicable, but for different reasons to the draft audited financial statement (Joint Ex. 2) prepared by the audit firm of Wentzel, Berry, Wentzel & Phillips, P.A. The auditing firm expressly disclaimed any ability to express any opinion because the scope of their work was not sufficient to enable the firm to express any opinion on the financial statements concerning the Debtor's condition as of April 30, 1999. Thus, the battle of experts is between the testimony and report of Miller, the witness for the Debtor and Markham, the expert presented by the Bank.

The report prepared by Miller was prepared from the in-house records of the Debtor. Miller prepared an internal balance sheet reflecting the Debtor's condition as of June 30, 1998 or five days after the LBO, which according to Miller reflects total assets of $5,032,421 versus total liabilities of $5,428,241, or a negative stockholder's equity of $395,820 (Pl.'s Ex. 1–1).

Miller made a number of adjustments to the balance sheet. He wrote off the accounts receivable as bad debts instead of adjusting for an allowance for the balance as doubtful accounts. He created a write-off of approximately $192,000. It might appear that that was a double write-off, an initial bad debt write-off of $191,991 and the doubtful account write-of of $72,250. However, it is equally possible that the last amount is in addition to the original write-off, and therefore, the total bad debt write-off of $192,000 was the correct number. Moreover, Miller testified that the initial $119,901 was a write-off of past accounts receivable and the $72,250 was an allowance for existing accounts receivable that would not be collected. Miller also adjusted the cost and estimated earnings, which was in excess of the billings by $102,000. His further adjustments involved liabilities for billings in excess of costs and estimated earnings by $596,212. He also included expense of income taxes as a liability in the amount of $119,810. Miller included of course, in the liability column of the debt created by the LBO, the sum of $2,000,000 (representing the $1.6 million loan from the Bank and the $400,000 loan from Kingsbury).

It should be noted at the outset that according to the testimony of Markham, the report prepared by Miller was unreliable and should not be accepted since the record reveals that the Debtor withheld billings in order to avoid paying taxes by the end of the fiscal year. As a result, there were accumulated and excessive billings after the end of the fiscal year and at the beginning of the new fiscal year. While the excessive billing might have represented a false picture of the income at any given time, it has not great significance for the total picture of insolvency.

It is clear that the report of Miller also leaves something to be desired, as it is not a certified audit report and was prepared from in-house records of the Debtor, the same records, at least in part that might have been used by Phillips, who was unable to warrant the correctness of the data and disclaimed the validity of his report, which was ultimately not issued. Be as it may however, as it will appear, it is the best available audit in this record and more reliable than the report prepared by Markham for the following reasons.

According to Markham, the Debtor was solvent and had a net equity of $901,392. She also indicates that the Debtor received a reasonable equivalent value for pledging all of the company's assets to the Bank. First, Markham allocated $1.5 million to the value of the Non–Compete and Consultation Agreements, which were signed by Kingsbury, who was the seller of the stock. This record is devoid of any evidence to indicate any rational basis to quantify any

value for these Agreements, and as a matter of fact, there is nothing in this record to indicate that Kingsbury ever gave any consultation to run the business after the LBO. Markham's valuation of the assets was based on book value rather than fair market value. Accordingly to her testimony, book value equals fair market value, which of course disregards depreciation. Moreover, as a general proposition, book values seldom equals fair market values. For instance, there was actually an appraisal available of the assets of the Debtor (Joint Ex. 5 and 7), but she completely ignored this appraisal, and to the contrary relied on the book value of the assets involved. She made no adjustment whatsoever to the book values. And, she did not make any adjustment to the financial statement of June 30, 1998, when she recognized a $1,900,000 profit, but did not recognize the tax liability attached to making that profit. Most telling, her explanation for failing to make adjustments was that she decided not to make any adjustments because there were too many errors in the financial statements as a result of the poor quality of the records. Therefore, she expressed the view that it was better to leave everything alone without the adjustments, which would be more credible than adjusting some accounts and not others. For example, the potential tax liability appeared to be $379,654, which she did not recognize as a liability.

Markham recognized in her report as an asset the pre-paid income tax of $120,000. This pre-paid income tax was related to the taxes due in the prior tax year, i.e., the one ending April 30, 1998 and notwithstanding, she kept it as an asset as to her report reflecting the Debtor's condition as of June 30, 1998. Markham made no adjustment whatsoever for work-in-progress, indicating a profit of over a million, because she had no adequate records to make the adjustment.

A great deal of time was spent on the alleged income position of the Debtor even though it is clear that the income during any given period has no relevance to the balance sheet test and only indirectly has any bearing on the values of the accounts receivable as an asset. It is especially true in a construction business, and it is apparently common in this practice, to bill out an invoice to the owner for work yet to be performed and not really earned. This, of course, distorts the picture because the expenses that must be incurred to perform that segment of the work are not reflected on the income statement and might indirectly impact the viability of the account and the value of the receivable involved.

It appears that she, just like Gualario, whom she criticized, failed to make any analysis of the accounts receivable and she also criticized Miller's construction analysis, but she prepared none herself. She ignored the potential liability of the Debtor's workmen's compensation claim of over $100,000 and said that she was not aware of such claim. She did not audit any of the receivables and accepted on face value, 100% of the face value of all accounts receivables, whether or not they were actually collectable or not.

In sum, based on this highly unsatisfactory record, and considering all of the data available for this Court to determine, this Court is satisfied with the requisite degree of proof, that the Debtor became insolvent to the extent of $395,820 as a result of the LBO.

In Count I, the Debtor requested the following relief: (1) a finding that the Debtor's pledge of its assets as collateral pursuant to the Security Agreement and guaranty to the Bank were fraudulent transfers pursuant to Fla. Stat. § 726.106(1); (2) that the Debtor may avoid said transfers pursuant to 11 U.S.C. § 544(b); (3) that the guaranty be termi-

nated; (4) that the Bank's security interest in the Debtor's collateral be declared invalid; and (5) that a money judgment equal to all sums paid under the Note be entered in favor of the Debtor and against the Bank.

In light of the foregoing, this Court finds that as a result of pledging of all of the assets of the Debtor to secure the debt of its principal, McIntyre, in the LBO, the Debtor was rendered insolvent.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Security Agreement executed by the Debtor pledging the assets of the Debtor as collateral to the loan of McIntyre to the Bank be, and the same is hereby, deemed invalid and unenforceable pursuant to 11 U.S.C. § 544(b) and Fla. Stat. § 726.106. It is further

ORDERED, ADJUDGED AND DECREED that the Guaranty executed by the Debtor be, and the same shall hereby, continue to be valid and enforceable. It is further

ORDERED, ADJUDGED AND DECREED that a pre-trial conference shall be held on May 23, 2002, beginning at 3:00 pm. at the United States Bankruptcy Courthouse, Fort Myers, Federal Building and Federal Courthouse, Room 4–117, Courtroom D, 2110 First Street, Fort Myers, Florida, to consider the issue of whether or not the Debtor is entitled to a money judgment in favor of the Debtor and against the Bank in the amount equal to the payments made to the Bank as a result of the LBO. It is further

ORDERED, ADJUDGED AND DECREED that a separate final judgment shall be entered in accordance with the foregoing.